61 N.J. Super. 355 (1959)
160 A.2d 851
JOHN EPPS, PETITIONER-RESPONDENT,
v.
RICHARD GOLD AND SONIA GOLD, HIS WIFE, RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1959.
Decided October 23, 1959.
*356 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. James J. Sheeran argued the cause for respondents-appellants.
Mr. Nathan Cholodenko argued the cause for petitioner-respondent.
The opinion of the court was delivered by FREUND, J.A.D.
Petitioner John Epps filed a petition for workmen's compensation, claiming that while working for the defendants he "was burning brush and a hot ash went into [his] eye." At the conclusion of the hearing before the Deputy Director, the petition was dismissed. On appeal, the County Court reversed and made an award in favor of the petitioner  hence the present appeal by respondents.
*357 The essential facts, as disclosed by the testimony, are in sharp dispute. The defendants, husband and wife, leased their one-family home at 27 Deerfield Road in West Caldwell, N.J., to Lt. Colonel Bartlett for the term of two years expiring August 1, 1956. Mrs. Gold lived with her father and mother, Mr. and Mrs. Kaufman, in Kenilworth, N.J., until the end of July of that year. Her husband was discharged from military service on July 6, 1956. Mrs. Gold testified that on August 1 the tenant vacated the premises. On August 3 she and her mother went to the house where she and her husband had formerly resided, to make plans for reoccupying the premises. By prior arrangement they met Mrs. Gold's father, together with petitioner, at the house.
Petitioner testified that he was positive it was a Saturday in May 1956 that Mr. Kaufman "picked him up" on McCarter Highway, Newark, and drove him to the Gold home. He had been told that Mrs. Gold had some cleaning to be done  taking paper off the walls, cutting and burning brush, and grading in the rear yard. He testified that Mrs. Gold told him he would be paid $11 a day, his lunch and transportation for his services. In describing the work, he said it took a "little better than three weeks" to remove paper from the walls and paint, and a couple of weeks to size the walls. He also said that he worked "a couple of weeks" cleaning around the premises. Epps said that he worked more than five days a week. When asked if the work was steady or intermittent, he testified, "I worked just as long as I wanted to work. I worked every day if I wanted to work."
On cross-examination he estimated that after doing the inside work it took him three or four days to do the grading and when asked again how long it took him to grade the back yard, he estimated "around five or six weeks." When asked how long it took him to sandpaper and to steam the paper off the walls, he said, "Around three days," and when asked the same question again he answered, "A little over *358 three weeks. I would say." He testified to helping size the walls, and when asked how long it took him, he said, "I estimate, about a couple of weeks, or two weeks or more." Epps was asked how long it took him to clean the hedgerow and answered, "I would say, around five or six weeks." He estimated that it took him around five or six weeks to grade the back yard, and then changed his testimony to say that it took him only "three or four days, or something like that." To fill in the low spots in the yard, Epps said, it took "a couple of weeks."
He testified that while he was burning brush on August 22 at 1:30 or 2:00 in the afternoon he "was burnt in the eye by a spark * * * it popped into my right eye, and I rubbed it." He said that he worked the rest of the day, that he told Mrs. Gold about his eye, and that she told him to use some butter which he said she gave him. At the end of the day's work, he said, Mrs. Kaufman drove him home and at that time he told her his eye was burning. The next morning, he said, his eye was swollen with pus and he telephoned the Gold home and told Mr. Gold that he had a bad eye and wanted someone to do something for him. He testified that two days later Mr. Kaufman took him to a doctor for medical treatment. He said that a few days later Mr. Kaufman took him to see Dr. Ney, from whom he received further treatment, the medical expenses being paid by Mr. Kaufman. After several visits to Dr. Ney's office, his medical secretary told Epps that Mr. Kaufman had left word that he would no longer be responsible for his medical expenses. Dr. Ney continued to treat the eye while petitioner was a patient at the Eye and Ear Infirmary in an effort to save it, but eventually the right eye was enucleated.
Mr. and Mrs. Gold and Mr. and Mrs. Kaufman all testified that Mrs. Gold lived with the Kaufmans in Kenilworth, N.J., until August 1956 while Colonel Bartlett was the tenant in occupancy of the Gold house and Mr. Gold was *359 in military service. They denied that the Gold premises were vacant in May, June or July of 1956.
Mr. Kaufman testified that on the morning of Friday, August 3, 1956, he went to petitioner's home and inquired if he wanted to do some general work for his daughter. He then drove Epps to the Gold home in Caldwell. During the trip he told petitioner he would be paid $1 an hour, his lunch and transportation, to which Epps agreed. He said that Epps did not work every day, and that the last day he worked was August 22, 1956. Kaufman further testified he was present when his daughter and Mrs. Kaufman told Epps that there was a nursery in the rear of the Gold property with shrubbery along the property line, and that he was not to make a fire since that constituted a hazard. They told Epps the rubbish and trash were picked up by municipal service.
Mrs. Gold, her father and mother denied that Epps had been employed at any time during May, June or July 1956. Mrs. Gold and her mother testified that it was on Friday, August 3, that Mr. Kaufman brought Epps to the vacant house in Caldwell to do some general work. When asked about the arrangements made with Epps, Mrs. Gold and her mother said it was agreed he was to receive $1 an hour, his lunch and transportation. Mrs. Gold testified that between August 3 and August 22 Epps did not work every day and on some days he worked only part time. The first work Epps did was to use a steam machine to remove the paper from the walls while Mrs. Gold and her mother used scrapers. After the sizing Mrs. Gold and her mother papered the walls. Mrs. Gold and her mother testified that Epps was told he was not to build any fires because of the nursery in back of the property and the shortage of water. On the morning of August 22 Epps was sifting some dirt and bringing it to the foundation of the house. Soon after lunch Mrs. Gold and her mother observed smoke and eventually, she said, the fire started by Epps became "a big one." Mrs. Gold and her mother used water to reduce the fire. They *360 denied Epps' testimony that he came into the house and said that he had got a spark in his eye and that he was given butter. Mrs. Gold further said that had Epps complained that his eye hurt, she would have taken him to a doctor. She testified he had left his work in a normal manner.
Mrs. Gold testified that Epps told her on August 22 (Wednesday) it was going to be his last day to work because he was going south to visit his mother and father on their farm to help with the harvesting. He mentioned leaving the next day on a four o'clock train. She denied Epps telephoned their home the next morning as testified to by him, but said that he phoned the following day (Friday) and told Mrs. Gold that he had not gone south and wanted her father's unlisted telephone number, although he did not say for what reason.
At the conclusion of the testimony the Deputy Director stated that he was "not impressed with petitioner's credibility, and that in [his] opinion the greater weight of the testimony preponderates in favor of the respondents." He was convinced that petitioner was expressly prohibited from burning the rubbish, since there were municipal facilities for its disposal. Nor did he believe that Epps' period of employment stretched over a matter of months as he testified. He said it was incredible that the Golds hired Epps for a matter of months at $11 a day  it "was phenomenal and out of reality." He inferred from their limited financial ability that Epps did not receive $11 a day. The Deputy said that the testimony of the respondents was reliable, more realistic, and more credible. From the testimony of two ophthalmologists who disagreed over whether Epps' eye could have been injured as a result of a burn, the Deputy concluded that there was no doubt in his mind that Epps had an infected eye that prompted enucleation. From his evaluation of all the testimony he found that the petitioner had failed to sustain the burden of proof that he was injured in the manner claimed.
*361 On appeal to the County Court the determination of the Deputy Director was reversed. Nevertheless, the County Court judge stated that there was "overwhelming evidence in contradiction of the petitioner's testimony, especially as to the time and duration of his employment," and agreed with the Deputy Director that Epps' testimony on these issues seriously affected his credibility.
On this appeal the respondents first argue that the petitioner was a casual employee and therefore, under the provisions of N.J.S.A. 34:15-36 defining a casual employee, he is barred from an award. We find it unnecessary to consider this issue in view of our conclusion that the petitioner failed to sustain the burden of proving by the weight of the credible evidence that his injuries were received in the course of his employment with the respondents. It has been established beyond peradventure that the burden of proof is on the plaintiff to justify an award for compensation, and it is not sustained unless the evidence preponderates in favor of the tendered hypothesis. Januszewski v. Public Service Coordinated Transport, 9 N.J. 107 (1952); Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533, 538 (Sup. Ct. 1939); Augustin v. Bank Building and Equipment Corp., 41 N.J. Super. 187 (Cty. Ct. 1956), affirmed 44 N.J. Super. 242 (App. Div. 1957).
This entire matter is factual; it depends upon the credibility of the various witnesses. We find upon examination and upon a comparison of Epps' testimony with the other testimony that it was inconsistent and not to be believed. Originally Epps charged in his first petition that Mr. Kaufman employed him, and later he filed the present petition charging that Mr. and Mrs. Gold hired him. He testified that there was no discussion as to the compensation he was to receive, but that Mrs. Gold arbitrarily said he would be paid $11 a day, lunch and transportation. The corroborated testimony of Mrs. Gold is to the contrary  that the parties agreed that Epps was to receive $1 an hour, his lunch and transportation. Furthermore, he testified that he began to *362 work for Mrs. Gold in May and that the house was vacant, although the testimony of several witnesses for the respondents clearly shows that the Gold house was occupied by a tenant until August 1 and that Epps first started his job on August 3. If he cannot be believed in these several respects, the Deputy was justified in discounting his testimony in its entirety.
Further to demonstrate the inconsistency of Epps' stories of what happened to him, it will be noted that in his petition for compensation he said he was "burning brush and a hot ash went into my eye." While testifying before the Deputy Director, he said, "I was burnt in my eye by a spark * * * it popped into my right eye and I rubbed it." Dr. Ney testified, "The history that I have here is that he was burning poison ivy and the smoke blew into his eyes, he got a burn of the right eye." No one, Mrs. Gold, Mrs. Kaufman, Mrs. Jeanne Saltzman, the neighbor, or Charles H. Parson, who was putting up cornices in the living and dining rooms at that time, any of whom could have seen or been made aware of the accident, could corroborate petitioner's claim that there was an accident. It is to be noted that Epps did not testify in rebuttal.
It is our responsibility to consider the advantage of the Deputy Director in judging of the credibility of witnesses. He has the opportunity to observe their appearance and demeanor. Gilbert v. Gilbert Machine Works, Inc., supra, 122 N.J.L., at page 538; Reis v. Breeze Corps., Inc., 129 N.J.L. 138, 140 (Sup. Ct. 1942); Mason v. Evans, 5 N.J. Super. 338, 341 (App. Div. 1949), and we give due regard to the opportunity of the trier of the facts to judge of the credibility of witnesses. R.R. 1:5-3(a). We have made a complete review of the voluminous testimony as required by Russo v. United States Trucking Corp., 26 N.J. 430, 435 (1958), and Ricciardi v. Marcalus Mfg. Co., 26 N.J. 445, 448 (1958), and in our opinion the testimony of the petitioner is so inconsistent that it is not credible, nor does it carry sufficient or persuasive weight to entitle him *363 to the benefits of compensation under the workmen's compensation statutes.
Judgment reversed.